**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
--------------------------------------------------------X
ROBERT GERRY,

                            Plaintiff,

                    -against-

BROOKHAVEN SCIENCE ASSOCIATES, LLC,
as manager and operator of Brookhaven National
Laboratory,

                          Defendant.
--------------------------------------------------------X

**MEMORANDUM OF**
**DECISION & ORDER**
14–cv–07221 (ADS) (ARL)

**APPEARANCES:**

**Scott Michael Mishkin, P.C.**
*Attorneys for the Plaintiff*
One Suffolk Square
Suite 240
Islandia, NY 11749
       By:    Kathleen Ann Tirelli, Esq., Of Counsel

**Morgan Lewis & Bockius, LLP**
*Attorneys for the Defendant*
101 Park Avenue
New York, NY 10178
       By:    Melissa C. Rodriguez, Esq.,
                Christopher A. Parlo, Esq.,
                Laura C. Rowntree, Esq., Of Counsel

**SPATT, District Judge**:

      This action arises out of allegations by the Plaintiff Robert Gerry (the "Plaintiff") that his

former employer, the Defendant Brookhaven Science Associates LLC (the "Defendant" or "BSA")

discriminated against him based on his race in violation of Title VII of the Civil Rights Act of

1964, as amended, 42 U.S.C. §§ 2000e *et seq.* ("Title VII") and the New York State Human Rights

Law, New York Executive Law §§ 290 *et seq.* (the "NYSHRL" or "NY Exec. L."). Before the

Court is a motion by the Defendant pursuant to Federal Rule of Civil Procedure ("Fed. R. Civ. P."

or "Rule") 56 for summary judgment dismissing the Plaintiff's claims. For the following reasons, the Defendant's motion is granted.

## I. BACKGROUND

### A. The Relevant Facts

The following facts are drawn from the Plaintiff's admissions to the Defendant's Statement of Material Facts (the "SMF"), and have been agreed upon by both parties unless otherwise noted.

#### 1. General Information

The Defendant is a nonprofit, limited liability company, responsible for operating Brookhaven National Laboratory ("BNL" or the "Laboratory") under a contract with the Department of Energy ("DOE") (SMF at ¶ 1). The Defendant's Laboratory Protection Division (the "LPD"), consists of the police and fire departments. (*Id.* at ¶ 24). The LPD police department protects staff and guests, DOE special nuclear materials, classified matter, and sensitive information; prevents the sabotage of programs that could result in significant scientific or financial impact; prevents the malevolent release of hazardous materials including radiological, chemical, and infectious agents; and provides various emergency services, including for hazardous material incidents. (*Id.* at ¶ 25).

The Defendant's Central Alarm Station (the "CAS") is housed in the LPD's police headquarters. (*Id.* at ¶ 28). The Defendant contends that the DOE ordered that the CAS be attended continually and manned 24 hours a day, but the Plaintiff argues that the DOE order did not apply to the BNL. (*Id.* at ¶ 32). The LPD is required to staff the CAS at all times, and to keep the door to the CAS closed. The Plaintiff contends that there were exceptions to those rules, including during shift changes, roll calls, and bathroom breaks. (*Id.* at ¶ 34). The Plaintiff says

that when he was an employee, there were periods every day when the CAS door was open. (*Id.*at ¶ 122).

The Plaintiff, a Caucasian male who was 51 years old when he initiated this action in 2014, began working for the Defendant as an LPD security police officer on October 6, 2003. (*Id.* at ¶¶ 48–49; Def.'s Ex. 26, Pl.'s EEOC Complaint). He was promoted to the position of lieutenant on August 9, 2010. (SMF at ¶ 50). One of his duties as a lieutenant included supervising any lower ranking LPD staff who were working during his tour. (*Id.* at ¶ 52). As a lieutenant, the Plaintiff was not a member of the Suffolk County Security Police Association (the "union"). (*Id.* at ¶ 50).

During the relevant period, the LPD used an administrative computer system for police reporting and tracking known as ACISS. (*Id.* at ¶ 59). Michael Delph, a Caucasian male, administered the ACISS system as part of his duties as an administrator for the Defendant. (*Id.* at ¶¶ 56–59). The Plaintiff believed that there were problems with ACISS—namely, that users found it difficult. (*Id.* at ¶ 61).

### 2. The Defendant's Workplace Policies

At all relevant times, the Defendant maintained an Equal Opportunity and Affirmative Action Policy Statement and Standards of Conduct and Business Ethics, which prohibit retaliation, discrimination and/or harassment on the basis of race, color, national origin, religion, age, gender, and any other basis protected by law. (*Id.* at ¶¶ 2–3). The Plaintiff attended Equal Employment Opportunity ("EEO") training and was familiar with the Defendant's Standards of Conduct and Business Ethics. (*Id.* at ¶¶ 5–6). The BSA workplace policy states that "supervisors, and others in positions of authority should act as role models in promoting [a respectful] atmosphere." (*Id.* at ¶ 11). The Plaintiff stated in his deposition that lying during an internal investigation, or

directing subordinates to lie during an internal investigation, would be a violation of those standards of conduct. (*Id.* at ¶¶ 14–15). The Defendant also had a discipline policy at all relevant times. (*Id.* at ¶16). The Plaintiff was aware of the discipline policy. (*Id.* at ¶ 17). That policy states that "[f]alsifying relevant information or testimony when the Laboratory is investigating possible rules violations, accidents or production problems or defending claims, charges or suits arising out or related to employment" is a "dischargeable behavior violation." (*Id.* at ¶ 18). The Plaintiff also testified in his deposition that he agreed that providing a false statement during an internal investigation of possible rule violations violates BSA's Discipline Policy and is a dischargeable offense that could lead to termination. (*Id.* at ¶ 22).

### 3. The "Hangman Drawing" Incident

On or about August 7, 2013, members of the Defendant's LPD staff, including the Plaintiff, met with a vendor to discuss possibly replacing ACISS. (*Id.* at ¶ 62). The following day, August 8, 2013, the Plaintiff supervised the morning roll call. (*Id.* at ¶ 65). He was the lieutenant for the LPD's 7:00 A.M. to 3:00 P.M. tour. (*Id.* at ¶ 63). Among those present at roll call were Sergeant Sharol Busby ("Busby"), who is an African American female; Security Police Officer Nicole Ward ("Ward"), who is an African American female; and Security Police Officer David Baulch ("Baulch"), who is a Caucasian male. (*Id.* at ¶¶ 42–47, 64). On August 8, 2013, the Plaintiff supervised all three of those individuals. (*Id.* at ¶ 53).

After roll call, Baulch asked whether the LPD would be installing a new computer system. (*Id.* at ¶ 68). The Plaintiff took out a piece of paper, drew five short, consecutive lines horizontally on the bottom, wrote an "A" on the first line, and an "S" on the last. (*Id.* at ¶ 69). He held up the paper and said that nothing was official, but that the ACISS system might be going away. (*Id.*) As others left the roll call area, Ward approached the Plaintiff and asked him "What's that game

4

called?" (*Id.* at ¶ 70). The Plaintiff drew a picture representing the "hangman" game, and asked Ward if that was the game to which she was referring. (*Id.* at ¶ 70).

The Plaintiff continued speaking with Ward, Busby and Baulch after the others had left. (*Id.* at ¶ 71). A picture was drawn depicting a hanging stick figure with a missing right leg. Over the hangman's head were the letters "D", "E", "L," and "F," and below the hangman A C _ _ S was written (the "hangman drawing"). (*Id.*) The Plaintiff contends that this was a new hangman drawn by Ward and that she had started writing ACISS on the bottom of it. (*Id.*)

The BNL is populated with surveillance cameras which are on a closed circuit television system ("CCTV"). (*Id.* at ¶ 35). The CCTV surveillance from August 8, 2013, showed that the CAS was unmanned and its door was open for a period of time during the morning. (*Id.* at ¶ 74). The Plaintiff argues that he was in the kitchen during that time, and that the kitchen was close enough to the CAS to deal with any issues that may have arisen. (*Id.*)

The hangman drawing was subsequently found on a LPD bulletin board, and was seen by Delph. (*Id.* at ¶ 73, 75). Delph took down the hangman drawing and notified several supervisors. (*Id.* at ¶ 76). Delph submitted a written witness statement about the incident. (*Id.* at ¶ 77).

### 4. Initial Investigation by Chief McCune

On August 9, 2013, then-Chief Steven McCune ("Chief McCune") began an initial inquiry into the hangman drawing. (*Id.* at ¶ 78). Baulch, Busby and Ward denied any knowledge of the drawing. (*Id.* at ¶ 80). Although the Plaintiff says that there is no written statement from Baulch illustrating that he denied any knowledge, (*id.*), the BSA investigation team's final report, discussed below, states that "McCune . . . interviewed Busby . . . Ward . . . and Baulch, all of whom denied having any knowledge of the drawing." (Def.'s Ex. 13, Final Investigation Report ("Final Investigation Report") at 1; *see also* Final Investigation Report at 10 (Baulch told the

investigation team that he told Chief McCune that he did not know anything)). Ward texted the Plaintiff during the investigation on the morning of August 9, 2013, "Hey rob I was told that [Chief] McCune wants to meet [] [Busby] and I with a union rep. Is it reg [sic] thing? Do you know what for so we aren't blind side[d]," to which Plaintiff responded: "no, no clue, I'll be back to [the building] in a few." (SMF at ¶ 82). The Plaintiff texted Ward later that morning, "Something changed, McCune wants a statement, you don't know anything," and that the Plaintiff would "take the rap" for the situation. (*Id.* at ¶¶ 83–84).

The Plaintiff met with Chief McCune on August 9, 2013 about the hangman drawing and told Chief McCune that he "did the whole thing." (*Id.* at ¶¶ 85–86). At Chief McCune's request, the Plaintiff wrote a statement that read

> While working the other morning I drew a picture of the ACISS system (hang man) as a joke. It was only a joke, I did not mean to hurt anyone['s] feeling. And for that I'm sorry. But as a police supervisor the ACISS system really is a complicated process overall, I just trying to say when one thing goes wrong the system fails. It must also be noted that a fellow worker informed me that Mike Delph was overheard making a phone call saying 'Mike[] is with the other knuckle draggers in a meeting right now, discussing a new system . . . .' I'm not a knuckle dragger, [I] only meant [it] as a joke.

(*Id.* at ¶ 89). The Defendant claims that the Plaintiff's initial oral and written statements to Chief McCune on August 9, 2013 were false. (*Id.* at ¶ 90). The Plaintiff testified in his deposition that he understood that submitting a false statement and directing a subordinate to do the same would obstruct Chief McCune's investigation. (*Id.* at ¶ 91).

Chief McCune approached the Plaintiff three times on August 9, 2013, after their initial meeting, and told him that he did not believe that the Plaintiff acted alone. (*Id.* at ¶¶ 92–93). On the third time, Chief McCune told the Plaintiff that he wanted a new statement from everyone involved. (*Id.* at ¶¶ 92–93). On August 10, 2013, the Plaintiff told Ward, Busby and Baulch about

his last discussion with Chief McCune.  (*Id.* at ¶ 95).  The Plaintiff gave Chief McCune a second written statement on August 11, 2013, in which he said,

> On 8–8–13 at the end of morning [r]oll call SPO Baulch asked a question about ACISS report writing system, I informed the [s]hift that there was a meeting yesterday about a new and improved, updated report writing system that might come on board.  Nothing is official at this time; the company is just looking into it. The shift just started to cheer and celebrate, because we were looking at changing the ACISS system. After [r]oll-call ended, a few of us started to play a word puzzle, after the word "ACISS" was solved.  I said get rid of it and get to work.  The word puzzle was about the "ACISS System" not about a person.

(*Id.* at ¶ 96–97).

### 5.  The BSA Investigation

After Chief McCune's initial inquiry, a team of the Defendant's staff members commenced an investigation into the hangman drawing incident.  (*Id.* at ¶ 98).  The team consisted of BSA Diversity Manager Shirley Kendall, an African–American female; BNL Deputy Manager of Safeguards and Security Leonard Butera, a Caucasian male; BSA Labor Relations Specialist Christina Mahabir, an Asian female (the "investigation team").  (*Id.* at ¶¶ 98–101).  On August 16, 2013, the Plaintiff was interviewed by the investigation team.  (*Id.* at ¶ 102).  He told the investigation team a different story from either of the versions that he told Chief McCune.  He told the BSA investigation team that he was the leading figure in the hangman game because he was the supervising officer, but that Ward was the instigator because she drew the hangman.  (*Id.* at ¶ 103).  He told them that he drew five blanks a piece of paper, and when Ward asked him what that game was called, the Plaintiff drew a box with a line on it.  (*Id.* at ¶ 104).  The Plaintiff said that this paper was thrown away.  (*Id.*)  He told the team that Ward wrote "DEL" on a new hangman drawing and that Baulch added an "F."  (*Id.* at ¶ 105; Final Investigation Report at 5).

The Plaintiff admitted to the investigators that he, Busby, Ward, and Baulch were outside the CAS during the hangman drawing incident, and that he had no idea who was in the CAS during

that time. (*Id.* at 106). Although the Plaintiff disputes here that he admitted to the investigation team that his initial statement to Chief McCune was false, he testified that he admitted that it was false in his deposition. (Def.'s Ex. 1 Pl.'s September 29, 2015 Deposition ("Pl.'s Dep.") at 372:19– 21).

On August 30, 2013, the investigation team interviewed Baulch. (SMF at ¶ 109). Baulch told them that he, Ward and Busby had all added letters to spell "DELF" at the top of the hangman drawing, and that the Plaintiff had written "<u>A</u> <u>C</u> _ _ <u>S</u> at the bottom of the page. (*Id.* at ¶ 110). Baulch did not mention two separate drawings. (Final Investigation Report at 167).

On September 3, 2013, the investigation team interviewed Ward and Busby separately. (SMF at ¶¶ 111, 121). Ward told the team that she, Busby, Baulch and the Plaintiff each drew a letter to spell "DELF" as a hint for others to identify "ACISS" in the hangman game, and Busby similarly said that everyone participated in the drawing of the hangman. (*Id.* at ¶¶ 112, 122). Both Ward and Busby told the team that Ward hung the drawing on the bulletin board while the Plaintiff and Busby held up a blank sheet of paper to block the CCTV camera. (*Id.* at ¶¶ 113, 123). Busby added that Baulch was not present during the posting of the drawing. (*Id.* at ¶ 123).

The Plaintiff claims that he did not help Busby block the camera—that he had told Baulch, Busby, and Ward to throw it out and did not know what happened after that. (*Id.* at ¶ 113; Final Investigation Report at 6). Busby told the team that that no one was in the CAS during the hangman drawing incident, and that the CAS door was open during that time. (*Id.* at ¶ 122). Ward and Busby both told the investigators that everyone involved in the hangman drawing knew that the drawing was going to be posted. (*Id.* at ¶¶ 114, 124). The Plaintiff says that he told Ward to throw the hangman drawing in the garbage, and he was in the kitchen when she hung it up and therefore he did not know that it was being posted. (*Id.* at ¶ 114).

Ward told the investigation team that her initial statement to Chief McCune was false, and that she gave a false statement because the Plaintiff instructed her to do so via text messages and on telephone calls. (*Id.* at ¶ 115). Ward showed the text messages to the investigation team. (*Id.* at ¶ 115). Busby told the investigators that she initially wrote a statement indicating she knew nothing about the drawing because SPO Ward had told her that the Plaintiff said he would take the full blame. (*Id.* at ¶125). Ward said she followed the Plaintiff's instructions to give Chief McCune inaccurate information because the Plaintiff was her supervisor. (*Id.* at ¶ 116). The Plaintiff contends that he did not tell Ward to give inaccurate information, just "not to say anything." (*Id.* at ¶ 116).

Ward and Busby told the investigation team that on August 10, 2013, the Plaintiff told them that he and Baulch had come up with a plan of what to tell the investigators. (*Id.* at ¶¶ 117, 126). Ward said that the Plaintiff's plan was for Ward to say that the Plaintiff created the drawing, but that he was in the CAS while Ward posted the drawing and Busby blocked the camera. (*Id.* at ¶ 117). Busby says that the Plaintiff's plan included saying that Ward drew the hangman, and that Busby hung it up. (*Id.* at ¶ 127). Ward and Busby told the investigation team that, after the Plaintiff told them his plan on August 10, 2013, Ward and Busby told the Plaintiff that it would not work and that they had to tell the truth. Ward said that the Plaintiff and Baulch stopped talking to her and Busby after that. (*Id.* at ¶ 118). The Plaintiff says that on August 10, 2013, he had advised everyone to tell the truth. (*Id.* at ¶117). Ward told the investigators that a former supervisor had called her at home to talk about the hangman drawing incident, and that Ward got the feeling that the former supervisor wanted her and Busby to accept all accountability for the hangman drawing incident. (*Id.* at ¶ 119). Busby said that Ward had told her about the phone call.

(*Id.* at ¶ 129). Busby and Ward said they reported their concerns of being scapegoated. (*Id.* at ¶¶ 119–20, 130).

The investigation team also interviewed Delph and other members of the LPD. (*Id.* at ¶ 132). Among other things, they reviewed the relevant union contracts, relevant BSA policies, the rosters from the three tours preceding Mr. Delph's discovery of the hangman drawing, and the written statements provided by the individuals involved. (*Id.* at ¶ 133). The investigators reviewed video surveillance footage obtained from the camera overlooking the CAS as well as the camera looking at the room where the roll call was held, which was covered during the posting of the hangman drawing. (*Id.* at ¶ 134).

### 6. The Investigation Team's Findings

The investigation team issued a "Final Investigative Report," which summarized the interviews taken and documents reviewed by the group, commented on the credibility of the witnesses, and summarized their findings. (*Id.* at ¶ 135). The investigation team made several conclusions, including that Plaintiff, Busby, Baulch, and Ward all participated in the creation and posting of the drawing. (*Id.* at ¶ 136). The investigation found several violations of varying degrees, and said that they were predominately triggered by the Plaintiff's improper supervision of the 7:00 a.m. to 3:00 p.m. tour on August 8, 2013. (*Id.* at ¶ 137). The investigators concluded that the Plaintiff instigated the drawing of the hangman in retaliation for Delph allegedly making an insulting comment about him. (*Id.* at ¶ 138).

The Plaintiff argues that the investigation team's finding that Ward and Busby were credible, and their finding that he and Baulch were not credible, is evidence of racial discrimination, and that this lead to his termination and. (*Id.* at 168).

### 7. The Repercussions of the Investigation Team's Findings

On October 9, 2013, after lengthy consideration, the Defendant issued several disciplinary measures. (*Id.* at ¶ 139). Ward was suspended for seven days without pay, Baulch was suspended for five days without pay, and Busby and the Plaintiff were terminated. (*Id.* at 140–44). The Plaintiff states that Busby was given the option to resign immediately after she was terminated. (*Id.* at ¶ 143). The Defendant says that Busby, as a union member, filed a grievance about her termination, and that grievance was ultimately resolved. (*Id.* at ¶ 143). The Plaintiff was not a union member. Certain aggravating factors were noted in Plaintiff's termination notice, including that he was the supervisor on duty and participated in creating a drawing during work time, and that he influenced his subordinates to post the drawing publicly; that he did not provide truthful information during the investigation; and that he used his rank to persuade subordinates to provide false information during an official inquiry. (*Id.* at ¶ 145).

The Plaintiff contends that Laboratory Protection Division Manager, Mike Pena, is typically responsible for making termination decisions. (*Id.* at ¶ 172). He also states that he was replaced by an African American male. (*Id.* at ¶ 188).

The Plaintiff subsequently suffered a knee injury which required surgery in 2014, and he never applied for work after his termination. (*Id.* at ¶¶ 146–47). The Plaintiff says that he looked for another position, but did not find any that were comparable or within a remuneration of ten percent of his former salary. (Pl.'s Dep. at 423–24).

### 8. Legal Filings

On or about April 7, 2014, the Plaintiff filed a charge of discrimination with the United States Equal Employment Opportunity Commission (the "EEOC"), alleging that the Defendant discriminated against him because of his race when it terminated him. (SMF at ¶ 148). On

September 25, 2014, the EEOC dismissed the Plaintiff's complaint because it was unable to conclude that the information before it established any violations of applicable law. (*Id.* at ¶ 149). On December 11, 2014, Plaintiff filed the complaint in the instant action. (*Id.* at ¶ 150).

## B. Relevant Procedural History

On December 11, 2014 the Plaintiff commenced this action by filing a complaint alleging that the Defendant discriminated against him based on his race in violation of Title VII and the NYSHRL. The Plaintiff also filed a claim against Shirley Kendall under the NYSHRL, but that claim was eventually dismissed and Shirley Kendall was terminated as a defendant. On March 10, 2015, the Defendant filed an answer to the Plaintiff's complaint.

On July 1, 2016, the Defendant filed a motion pursuant to Rule 56 for summary judgment dismissing the complaint in its entirety.

## II. DISCUSSION

## A. The Standard of Review

Under Fed. R. Civ. P. 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." When deciding a motion for summary judgment, "[t]he Court 'must draw all reasonable inferences and resolve all ambiguities in favor of the non–moving party.'" *Castle Rock Entm't, Inc. v. Carol Publ'g Grp., Inc.*, 150 F.3d 132, 137 (2d Cir. 1998) (quoting *Garza v. Marine Transp. Lines, Inc.*, 861 F.2d 23, 26 (2d Cir. 1998)).

"[A]t the summary judgment stage the judge's function is not [] to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Redd v. N.Y. State Div. of Parole*, 678 F.3d 166, 173–74 (2d Cir. 2012) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S. Ct. 2505, 2511, 91 L. Ed. 2d 202 (1986) (internal quotation

marks omitted)). In other words, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Barrows v. Seneca Foods Corp.,* 512 F. App'x 115, 117 (2d Cir. 2013) (quoting *Redd v. New York Div. of Parole,* 678 F.3d 166, 174 (2d Cir. 2012) (internal quotation marks omitted)). The Court should not attempt to resolve issues of fact, but rather "assess whether there are any factual issues to be tried." *Cuff ex rel. B.C. v. Valley Cent. Sch. Dist.,* 677 F.3d 109, 119 (2d Cir. 2012).

The movant has the burden of demonstrating the absence of genuine issues of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986). If a nonmoving party fails to make a sufficient showing on an essential element of their case where they will have the burden of proof, then summary judgment is appropriate. *Id.* at 323. If the nonmoving party submits evidence which is "merely colorable," legally sufficient opposition to the motion for summary judgment is not met. *Liberty Lobby,* 477 U.S. at 249. The mere existence of a scintilla of evidence in support of the nonmoving party's position is insufficient; there must be evidence on which the jury could reasonably find for him. *See Dawson v. Cty. of Westchester,* 373 F.3d 265, 272 (2d Cir. 2004).

**B. As to the Plaintiff's Title VII and NYSHRL Discrimination Claims**

Title VII makes it "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex or national origin." 42 U.S.C. §§ 2000e–2(a)(1). The NYSHRL provides, in relevant part, that "[i]t shall be an unlawful discriminatory practice . . . for an employer . . . because of an individual's . . . race [or] . . . sex . . . to discriminate against such individual in compensation or in terms, conditions or privileges of employment." N.Y. EXEC. L. § 296(1)(a). "We treat Title VII and [the NYSHRL]

13

discrimination claims as analytically identical, applying the same standards of proof to both claims." *Salamon v. Our Lady of Victory Hosp.,* 514 F.3d 217, 226 fn. 9 (2d Cir. 2008). Therefore, this Court will analyze both of the Plaintiff's claims under the same standard.

In *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), the Supreme Court set forth the burden shifting framework under which Title VII discrimination claims are analyzed. The Plaintiff has the initial burden of proving a *prima facie* case of discrimination. *Id.* at 802. If the Plaintiff establishes a *prima facie* case, the burden shifts to the Defendant to articulate a legitimate, non-discriminatory reason for his termination. *Id.* If the Defendant succeeds on its burden, the presumption of animus "drops out of the picture." *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 510–11, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). The Plaintiff must then show that the Defendant's actions were the result of impermissible discrimination. *Holcomb v. Iona College,* 521 F.3d 130,138 (2d Cir. 2008). "The plaintiff need not prove that the explanation offered by the employer was entirely false 'but only that ... [the defendant's] stated reason was not the only reason' and that consideration of an impermissible factor 'did make a difference.' " *Phillips v. Dow Jones & Co.,* No. 04 Civ. 5178, 2009 WL 2568437, at *9 (S.D.N.Y. Aug. 17, 2009) (*quoting Montana v. First Fed. Sav. & Loan Ass'n of Rochester,* 869 F.2d 100, 105 (2d Cir. 1989)).

The Plaintiff's burden at this stage is to prove that "the evidence, taken as a whole, is sufficient to support a reasonable inference that prohibited discrimination occurred." *James v. New York Racing Ass'n.,* 233 F.3d 149, 156 (2d Cir. 2000); *see also Schnabel v. Abramson,* 232 F.3d 83, 90 (2d Cir. 2000) (courts should examine the entire record to determine whether the plaintiff could satisfy his "ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff") (internal citations and quotation marks omitted)).

To defeat the motion for summary judgment the Plaintiff "must present evidence sufficient to allow a rational factfinder to infer that the employer was actually motivated in whole or in part by . . . discrimination." *Grady v. Affiliated Cent., Inc.,* 130 F.3d 553, 560 (2d Cir. 1997).

"[T]rial courts must be especially chary in handing out summary judgment in discrimination cases, because in such cases the employer's intent is ordinarily at issue." *Chertkova v. Conn. Gen. Life. Ins. Co.,* 92 F.3d 81, 87 (2d Cir.1996) (internal citations omitted). "Since it is rare indeed to find in an employer's records proof that a personnel decision was made for a discriminatory reason, whatever other relevant . . . materials are before the district court must be carefully scrutinized for circumstantial evidence that could support an inference of discrimination." *Id.*

### 1.  As to whether the Plaintiff has presented a *Prima Facie* Case of Discrimination

To establish a *prima facie* case of discrimination under Title VII and the NYSHRL, a Plaintiff must show that he "(1) is a member of a protected class; (2) was performing his duties satisfactorily; (3) was discharged; and that (4) his discharge occurred under circumstances giving rise to an inference of discrimination on the basis of his membership in the protected class." *Graham v. Long Island R.R.*, 230 F.3d 34, 38 (2d Cir. 2000) (citing *Chambers v. TRM Copy Centers Corp.*, 43 F.3d 29, 37 (2d Cir. 1994)).

### A.  Protected Class

The Plaintiff argues that, as a member of the Caucasian race, he is a member of a protected class under Title VII. The Defendant does not dispute that the Plaintiff is a member of a protected class. The Court agrees that the Plaintiff has sufficiently alleged that he is a member of a protected class for the purposes of Title VII.

The Supreme Court ruled that Title VII "prohibits all racial discrimination in employment, without exception for any group of particular employees . . . ." *McDonald v. Santa Fe Trail Transp. Co.,* 427 U.S. 273, 283, 96 S. Ct. 2574, 2577, 49 L. Ed. 2d 493 (1976).  It further held that the dictates of Title VII "are not limited to discrimination against members of any particular race [and Title VII] proscribe[s] racial discrimination in private employment against whites on the same terms as racial discrimination against nonwhites." *Id.* at 278–79, 96 S. Ct. at 2577; *see also Barella v. Vill. of Freeport*, 16 F. Supp. 3d 144, 161 (E.D.N.Y. 2014) (Spatt, J.) (stating that "absent binding authority to the contrary, this court must assume that *McDonald* means what it says: a Title VII case is a Title VII case on the 'same terms' for plaintiffs of all races," and declining to impose a heightened *prima facie* standard for a white plaintiff) (quoting *Cully v. Milliman & Robertson, Inc.*, 20 F. Supp. 2d 636, 641 (S.D.N.Y. 1998)).  Therefore, the Court finds that the Plaintiff has sufficiently alleged that he is a member of a protected class based on race.

### B.  Satisfactory Performance of Duties

The Defendant argues that the Plaintiff did not satisfactorily perform his duties because he violated BSA policy and therefore fails to present a *prima facie* case.  The Plaintiff says that the second prong is one of qualification and that he was clearly qualified because he performed his job for over a decade and was continuously promoted.  The Court declines to adopt the Defendant's application of the qualification prong and finds that the Plaintiff has satisfied the performance prong.

 Although the *Graham* court classified the second prong of the *prima facie* test as the satisfactory performance of duties, 230 F.3d at 38, the second prong relates to the Plaintiff's qualifications for the position.  *See Texas Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 254, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981) (a *prima facie* case requires that plaintiff show that she

was qualified for the position); *see also Int'l Bhd. of Teamsters v. United States,* 431 U.S. 324, 358 n. 44, 97 S. Ct. 1843, 52 L. Ed. 2d 396 (1977) (same). The Second Circuit said that "a mere variation in terminology between 'qualified for the position' and 'performing satisfactorily' would not be significant so long as, in substance, all that is required is that the plaintiff establish basic eligibility for the position at issue, and not the greater showing that he satisfies the employer." *Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 92 (2d Cir. 2001), *as amended* (June 6, 2001). The Second Circuit in *Slattery* stressed that "the qualification prong must not [] be interpreted in such a way as to shift onto the plaintiff an obligation to anticipate and disprove, in his *prima facie* case, the employer's proffer of a legitimate, non-discriminatory basis for its decision." *Id.*

The Plaintiff need only make a minimal showing at this juncture: that he possessed the basic skills that were necessary to perform the job. *Id.*; *Owens v. New York City Housing Auth.,* 934 F.2d 405, 409 (2d Cir. 1991). Where, as here, the Plaintiff had already been hired by the Defendant; had been promoted over his approximately ten-year tenure; and appears to have performed his job well during that tenure, "the inference of minimal qualification is not difficult to draw." *Slattery*, 248 F.3d at 92 (citing *Gregory v. Daly,* 243 F.3d 687, 695–96 (2d Cir. 2001)). The Plaintiff does not have to prove, at this stage, that he was performing his duties satisfactorily. He must merely prove that he was qualified. *See Chukwurah v. Stop & Shop Supermarket Co., LLC,* 354 F. App'x. 492, 494–95 (2d Cir. 2009) (summary order) (holding that it would be "error to find that plaintiff has not established his *prima facie* case merely because [the] employer was dissatisfied with plaintiff's performance."); *Sista v. CDC Ixis N. Am., Inc.,* 445 F.3d 161, 172 (2d Cir. 2006) (noting that even if an employer could legitimately determine that the employee's conduct was unacceptable, "these considerations go to the employer's ability to rebut a prima facie

case . . . , not to the showing of the prima facie case itself"); *Slattery*, 248 F.3d at 92 ("[A]ll that is required is that the plaintiff establish basic eligibility for the position at issue, and not the greater showing that he satisfies the employer."); *Gregory*, 243 F.3d at 696 ("In a discharge case in which the employer has already hired the employee into the job in question, the inference of minimal qualification is, of course, easier to draw than in a hiring or promotion case because, by hiring the employee, the employer itself has already expressed a belief that she is minimally qualified."). The Court believes that the Plaintiff has met that burden.

The Defendant asks the Court to follow the somewhat unclear logic of *Thornley v. Penton Publ'g Inc.*, 104 F.3d 26 (2d Cir. 1997), where the Second Circuit said that as to the qualification prong, a plaintiff must demonstrate "satisfactory job performance, in accordance with the particular employer's criteria for satisfactory performance." *Id.* at 30. This Court declines to adopt the *Thornley* standard, because it finds that the *Slattery* standard is in line with the spirit of Title VII and the *McDonnell* burden-shifting framework. Although *Slattery* did not overrule *Thornley*, several courts have called *Thornley* into doubt either based on the holding of *Slattery*, or because *Thornley* apparently subverts the intent of Title VII. *See Markovich v. City of N.Y.*, No. 09–CV–5553, 2013 WL 11332465, at *5 (E.D.N.Y. Aug. 21, 2013), *aff'd*, 588 F. App'x 76 (2d Cir. 2015) (citing and quoting *Slattery* in finding that the defendant, via *Thornley*, sought to shift the obligation to prove a legitimate, non–discriminatory basis for its employment decision to the plaintiff); *Mattera v. JPMorgan Chase Corp.*, 740 F. Supp. 2d 561, 572 (S.D.N.Y. 2010) (declining to follow Thornley, and stating that *Slattery* and its progeny is "the standard more often employed by the Second Circuit and [] the standard much more easily applied . . . .") (citing to *DeMarco v. Stony Brook Clinical Practice Mgmt. Plan*, 348 F. App'x 651, 653 (2d Cir. 2009) ("Even if the undisputed facts indicate that [the plaintiff] intentionally deceived [her employer], it

does not necessarily follow that she is not qualified for the position . . . .")); *Olufowobi v. Cardinal Health 200, Inc.*, No. 3:03–CV–1161, 2006 WL 1455625, at *6 n.7 (D. Conn. May 25, 2006) (same); *Offutt v. Gannett Satellite Info. Network, Inc.*, No. 98–CV–0766, 1998 WL 872443, at *4 n.3 (S.D.N.Y. Dec. 14, 1998) (stating that *Thornley* "has the potential to undermine Title VII . . . by insulating the employer from an inquiry by the factfinder into the potentially pretextual nature of the employer's reason for firing the employee"); s*ee also Boston v. Macfadden Pub., Inc.*, No. 09–CV–457, 2010 WL 3785541, at *7 (S.D.N.Y. Sept. 29, 2010) ("Because an employee's alleged or admitted misconduct is often inextricably intertwined with the employer's legitimate, non-discriminatory reason for the employee's termination, however, it may be inappropriate in such cases to evaluate the employee's misconduct in the context of the *prima facie* case.") (citing *Ruiz v. Cty. of Rockland*, 609 F.3d 486 (2d Cir. 2010)).

Accordingly, the Court disagrees with the Defendant that, as a matter of law, the Plaintiff was not qualified for his position.

As it is undisputed that the Plaintiff was discharged, the Court turns to address the crux of the dispute, which is whether his termination gives rise to an inference of discrimination.

### C. As to whether the Plaintiff's Discharge Occurred under Circumstances Giving Rise to an Inference of Discrimination

The Plaintiff argues that because Ward and Busby, two African American females, were treated differently, his termination gives rise to an inference of discrimination. The Defendant contends that neither of those individuals were similarly situated. The Court agrees that the Plaintiff has failed to show that either Busby or Ward were similarly situated.

To raise an inference of discrimination, a plaintiff must show that his employer "treated him less favorably than a similarly situated employee outside his protected group." *Graham*, 230

F.3d at 39; *Norville v. Staten Island Univ. Hosp.,* 196 F.3d 89, 95 (2d Cir. 1999); *Shumway v. United Parcel Serv., Inc.,* 118 F.3d 60, 63 (2d Cir. 1997). The comparable employee(s) "must be similarly situated in all material respects—not in all respects." *McGuinness v. Lincoln Hall*, 263 F.3d 49, 53 (2d Cir. 2001) (citing and quoting *Shumway*, 118 F.3d at 64) (internal quotation marks and emphasis omitted). "What constitutes 'all material respects' therefore varies somewhat from case to case and . . . must be judged based on (1) whether the plaintiff and those he maintains were similarly situated were subject to the same workplace standards and (2) whether the conduct for which the employer imposed discipline was of comparable seriousness." *Graham*, 230 F.3d at 40 (citing *Norville*, 196 F.3d at 96).

In the Court's view, the Plaintiff failed to allege that any of the "comparable" employees were subject to the same workplace standards, or that they engaged in conduct of comparable seriousness. The Plaintiff was a lieutenant, and on the date of the hangman incident, he supervised everyone else that was involved in the drawing. Ward was a sergeant, and Busby and Baulch were both security police officers. As the Plaintiff admitted in his deposition, he was the "leading figure" because he was the supervising officer. (SMF at ¶ 103). Accordingly, the Defendant held him to a higher standard, as its workplace policy provided. (*See* Def.'s Ex. 3, BNL's Standards of Conduct and Business Ethics at 22 ("Supervisors must be careful in word and conduct to avoid placing, or seeming to place pressure on subordinates that could cause them to deviate from acceptable norms of conduct.")); *id*. at 6 (containing a separate section for the conduct of supervisors).

Specifically, the workplace policy states that "[m]anagers, supervisors, and others in positions of authority should act as role models." (SMF at ¶ 11). The Plaintiff was supposed to act as a role model for the employees that he supervised, and the Defendant did not believe that he

did. The Plaintiff, as Ward and Busby's supervisor, was held to a different workplace standard than Ward or Busby and is therefore not similarly situated. *See, e.g., Kearney v. ABN AMRO, Inc.*, 738 F. Supp. 2d 419, 429 (S.D.N.Y. 2010) (stating that the plaintiff, who only oversaw twenty employees, was not similarly situated to another manager who oversaw one hundred employees); *Sealy v. Hertz Corp.*, 688 F. Supp. 2d 247, 256 (S.D.N.Y. 2009) ("Plaintiff and his manager occupy different levels within the company and are not alleged to have committed the same rule infractions. Thus, there is no basis in the record from which to conclude that they are similarly situated."); *Gupta v. N.Y. City Sch. Const. Auth.*, No. 04–CV–2896, 2007 WL 1976099, at *15 (E.D.N.Y. May 15, 2007), *report and recommendation adopted in part, rejected in part*, No. 04 CV 2896 NGG LB, 2007 WL 1827418 (E.D.N.Y. June 25, 2007), *aff'd*, 305 F. App'x 687 (2d Cir. 2008) (holding that managers on different levels of the company hierarchy were not similarly situated); *Loucar v. Boston Mkt. Corp.*, 294 F. Supp. 2d 472, 480 (S.D.N.Y. 2003) (holding that the plaintiff was not similarly situated to an employee with five more years of management experience and it was not even clear that the plaintiff was a manager); *Ortiz v. Brookstone Co.*, 274 F. Supp. 2d 456, 463 (S.D.N.Y. 2003) (holding that plaintiff, who was a manager in training, was not similarly situated to a manager who was his supervisor).

The Plaintiff has also failed to show that the conduct of Ward or Busby was of comparable seriousness. Although, like the Plaintiff, they both gave inaccurate information during the initial investigation, they did so at his direction. Busby told the investigators that she initially gave inaccurate information because Ward told her that the Plaintiff was going to take full blame. (SMF at ¶ 125). Despite the Plaintiff's protestations that he did not tell Ward to give inaccurate information and that he did not provide false testimony, the record discloses that both of those facts are true. The Plaintiff admits that he told Ward to say that she did not know anything about

the hangman drawing—which was inaccurate. (SMF at ¶ 116). Ward knew all about the hangman drawing and she participated in it. The Plaintiff testified in his deposition that his statement to Chief McCune was false and that he told the investigation team that his statement to McCune was false. (Pl. Dep. at 372:19–21). The version of events that the Plaintiff gave to the investigation team was also very different from either of the two versions he presented to Chief McCune. He not only gave inaccurate information during the investigation, but he also encouraged officers whom he supervised to do the same. The Plaintiff has therefore failed to show that Busby or Ward's conduct was comparably serious. *See, e.g., Albury v. J.P. Morgan Chase,* No. 03–cv–2007, 2005 WL 746440, at *10 (S.D.N.Y. Mar. 31, 2005) (finding proposed comparators not similarly situated because their infraction of the employer's policy against accessing confidential information "did not rise to the same level of seriousness as plaintiff's"); *Pierce v. Netzel*, No. 98–cv–532A, 2004 WL 1055959, at *13 (W.D.N.Y. May 10, 2004) (citing *Shumway,* 118 F.3d at 64) (noting that part of the "all material respects" standard is a requirement that there not exist "any differentiating or mitigating circumstances that would distinguish their conduct or the appropriate discipline for it"); *Bennett v. Watson Wyatt & Co.,* 136 F. Supp. 2d 236, 250 (S.D.N.Y. 2001) (finding that the plaintiff failed to show pretext because his misconduct was "by far, the most egregious," and therefore there existed "such differentiating or mitigating circumstances that would distinguish their conduct or the appropriate discipline for it"), *reconsideration denied,* 156 F. Supp. 2d 270 (S.D.N.Y. 2001), *aff'd,* 51 F. App'x 55 (2d Cir. 2002) (summary order).

Therefore, the Plaintiff fails under the fourth prong of the *prima facie* phase of the McDonnell-Douglas burden shifting framework. As the Plaintiff has failed to present a *prima facie* case of discrimination under Title VII or the NYSHRL, the Defendant's motion for summary judgment on that basis is granted.

**2. As to the Defendant's Proffered Legitimate Non–discriminatory Reasons for Termination**

Even if the Plaintiff were to establish a *prima facie* case, the Court alternatively finds that the Defendant would still be entitled to summary judgment because the Plaintiff has not established that the Defendant's legitimate non-discriminatory reasons for his termination were a pretext. The Defendant articulated legitimate non–discriminatory reasons for his termination—namely, that he engaged in the hangman drawing; that he lied to his supervisor about it; that he encouraged others to lie about it; and that he left the CAS open and unattended during the incident. A plaintiff may still prevail "upon a showing that the employer's given legitimate reason is unworthy of credence, that the reason supplied was not the true reason for the unfavorable employment decision." *Dister v. Continental Group, Inc.,* 859 F.2d 1108, 1116 (2d Cir. 1988). However, as stated above, the record fails to reveal any facts from which a jury could conclude that the Defendant's reasons for the Plaintiff's termination were not worthy of belief. His conduct was distinct from and more serious than that of the other participants in the hangman drawing incident because he was their supervisor and encouraged them to give false information.

## III. CONCLUSION

Accordingly, the Defendant's motion for summary judgment pursuant to FED. R. CIV. P. 56 dismissing the Plaintiff's Title VII and NYSHRL claims is granted because the Plaintiff has failed to present a *prima facie* case of discrimination. The Clerk of the Court is respectfully directed to close the case.

It is **SO ORDERED:**

Dated: Central Islip, New York

December 13, 2016

_____/s/ Arthur D. Spatt_____

ARTHUR D. SPATT

United States District Judge